## JOPLIN SUPPLY COMPANY, Respondent, v. W. H. WEST et al., Appellants.

Springfield Court of Appeals, July 7, 1910.

1. PARTNERSHIP: Mines and Mining. Where persons acquire interest in lands apparently for the sole purpose of working mines in them, they must be considered as entering into a commercial partnership.

2. ——: ——: Partnership by Operation of Law. A mining partnership relation may arise in two ways: first, by operation of law where there is no partnership agreement, but co-operation by co-owners or joint tenants in the working of mining property; and second, by agreement of the co-owners or joint tenants. Evidence in this case examined and held sufficient to authorize the trial court to find that a mining partnership existed by operation of law.

3. MECHANICS' LIENS: Statutory Creation. Mechanics' liens are purely a creation of statute and were unknown at common law.

4. ——: ——: Where Land and Buildings are not Owned by Same Party. For many years it was held that where the buildings and lands were not owned by the same party, or were in any way separate in interest the lien failed. To remedy

the situation legislation has been adopted in many states extending the privileges of the lien to mechanics and materialmen who have furnished labor or material for buildings erected by persons on the lands of another.

5. ———: ———: ———: Constitutional Law: Statutory Construction. The right to give the mechanics and materialmen a lien upon buildings separate from the land is not curtailed by constitutional provisions and the whole question is purely statutory. It requires special legislation to give the lien in these instances, but the statute should be liberally construed.

6. ———: Trade Fixtures on Leased Property. The courts have held that section 4206, Revised Statutes 1899, which provides for a mechanic's lien on buildings or improvements erected on leased or licensed lands does not apply to cases where the tenant has put trade fixtures upon the property under a contract with the landlord whereby the improvements remain the personal property of the tenant.

7. ———: Mines and Mining: Lien on Mining Property of Licensee. section 4206, as amended by the Laws of 1901, providing for a mechanic's lien to persons erecting improvements and furnishing material on licensed lots, is construed to cover a case where material and machinery were furnished in the erection of a concentrating plant on a tract of land held under a mining license.

8. ———: Improvements by Lessee. The courts hold that a mechanic's lien does not extend to improvements on all leased lots, but only to such improvements as become a part of the real estate, and do not remain the personal property of the tenant. This is the construction given the statute (Revised Statutes 1899, section 4206, as amended by the Laws of 1901), so far as the same relates to leasehold interests, both prior and subsequent to the amendment.

9. ———: Improvements by Licensee. A reasonable construction of section 4206, Revised Statutes 1899, as amended by the Laws of 1901, which provides for a mechanic's lien on improvements made on licensed lots, could not limit the lien to those cases where the improvements become a part of the real estate and the licensee has no right to remove them. Under such a construction the statute would become a nullity, for the rule is that if the licensee has erected buildings or improvements upon the land for his own use, he has the right to remove the same and they remain his personal property and he must be given a reasonable time within which to remove the same.

10. ———: ———: Mines and Mining. In amending section 4206, Revised Statutes 1899, by the Act of 1901, it was the intention of the Legislature to give the benefits of the mechanics' lien

to all persons who may furnish material or labor in the erection of those mining plants by the licensee upon the licensed lots.

11. **LEASE: License.** There is a marked difference between a license and a lease. Under a lease, the right of possession against the world is given to the tenant, while a license creates no interest in the land, but is simply an authority or power to use it in some specific way.

12. **STATUTORY CONSTRUCTION.** The primary rule for the construction of all statutes of this State as laid down in the Revised Statutes, is that words and phrases shall be taken in their plain and ordinary meaning or usual sense, and regard is to be had to their general and proper use.

13. ——. Statutes must be construed in reference to the subject-matter, the objects which prompted and induced their enactment and the mischief they were intended to remedy.

14. **PLEADING: Mechanic's Lien: Personal Property: Description of Land.** Where a mechanic's lien is sought against the buildings and improvements erected on lands held under a license, the fact that the land on which the improvements are located is not described in the petition with technical accuracy is not material.

Appeal from Jasper Circuit Court.—*Hon. David E. Blair,* Judge.

AFFIRMED.

*McIndoe & Thurman* for appellants.

(1) There can be no recovery where there is no actual partnership, unless there is a holding out of such partnership and the sale made in faith and belief of such partnership. Halo v. Mayer, 102 Mo. 93; Rimel v. Hayes, 83 Mo. 201; Thompson v. Bank, 111 U. S. 530, 28 L. Add. 507; Bissell v. Ward, 129 Mo. 439. (2) The mere participation in profits or the mere acquiring of an interest is not sufficient to constitute a partnership *inter se.* Bank of Osceola v. Outhwaite, 50 Mo. App. 124; Kellogg v. McCleverty, 89 Mo. App. 154; Mackey v. Mott, 146 Mo. 231; Hazel v. Clark, 89 Mo. App. 78.

(3)    A chattel annexed to a chattel is not subject to a lien under the statutes of this State.   Ottumwa v. Muir, 126 Mo. App. 590; Springfield Foundry & Machine Co. v. Cole, 130 Mo. 1; Ranson v. Shehan, 78 Mo. 668; Williams v. Porter, 51 Mo. 441; Wright v. Beards, 69 Mo. 548; Planing Mill Co. v. Christophal, 60 Mo. App. 111.
(4)    There must be a contract and sale of goods to the owner of the premises in order to have the benefit of a lien.   Sibley v. Casey, 6 Mo. 164; Davis v. Mogsvell Co., 63 Mo. App. 447.

*Haywood Scott* for respondent.

(1)    The agreements between Ayres and West, Allen and Livingston et al. for the operation of the mine thereunder were also sufficient to constitute a mining partnership from the time they agreed to operate the mine thereunder until the corporation began operating the property.   Freeman v. Hemenway, 75 Mo. App. 616; Dale & Bennett v. Mining Co., 110 Mo. App. 317; Tamblyn v. Scott, 111 Mo. App. 46; Snyder v. Burnham, 77 Mo. 52; 22 Am. and Eng. Ency. Law, 226.   (2)   A partnership may as well be predicated of an agreement to share net profits, as of an agreement to share the profits and losses, and the same rule applies.   Torbert v. Jeffrey, 161 Mo. 646; Corey v. Codwell, 86 Mich. 570;   49 N. W. 611; 63 L. R. A. 260.   (3)   Persons may become partners by actually carrying on a common business before incorporating.   Simmons v. Ingram, 78 Mo. App. 603; Martin v. Fewell, 79 Mo. App. 401; Richardson v. Pitts, 71 Mo. App. 128; Furniture Co. v. Crawford, 127 Mo. 364; 27 Cyc. 755; 22 Am. and Eng. Ency. Law, 226.
(4)    The amendment of 1901 to section 4206, Revised Statutes 1899, extended the lien to buildings or other improvements erected or materials furnished on licensed lots or land with right to remove same.   Laws of 1901, p. 206.

GRAY, J.—The respondent instituted. this suit in the circuit court of Jasper county, against H. A. Ayres, James D. Livingston, W. H. West, as partners, Buenos Ayres Mining Company, and the Clermont Land, Mining & Milling Company, to recover a judgment against the partners for the sum of $730.58, and asking that the sum be declared a lien against a certain concentrating plant, under the statutes relating to mechanics' liens.

The petition further alleges that the plaintiff, at the instance and request of the said partners, furnished an engine, materials and machinery for the construction of one complete concentrating plant owned by the said partners, and that all of said material and machinery were used in the construction of said plant, and all situated and located upon a certain tract of land held by said Ayres under a license from the Scranton Mining & Smelting Company, the owner of the real estate, for a period of ten years from the 16th day of December, 1908, and specifically describing one acre of said tract upon which it was claimed the concentrating plant was located.

The petition further alleges the sale and transfer of the plant and license to the Buenos Ayres Mining Company, and a like sale and transfer by that company to the defendant, Clermont Land, Mining & Milling Company, a corporation organized under the laws of the State of Kansas.

The Buenos Ayres Mining Company answered, and in addition to a general denial, alleged that none of the defendants ever owned any interest or estate in the premises described in plaintiff's petition, and that the only interest any of the defendants ever had was merely a license from the landowner, without the right of assignment, and the licensee had the privilege of removing said buildings and structure from the premises at the termination of said license.

The answer of this defendant further denied that plaintiff sold any goods or furnished any material to the

defendant Ayres but averred the fact to be that if the plaintiff did sell any goods that entered into the buildings, the same were sold to the Ayres Brokerage Company, a corporation.

The defendants, Allen, West and Livingston, filed an answer duly verified, denying that they were partners of H. A. Ayres and further denying that any of the defendants ever owned a leasehold or any interest or estate in the premises described in plaintiff's petition; and that if H. A. Ayres ever did own any interest, the same was merely a license, and the licensee had the privilege of removing the buildings and structures from the premises. They also denied that plaintiff sold any goods to Ayres, but alleged the sale was to the Ayres Brokerage Company. The other defendants did not answer.

The case was tried before the court without a jury, resulting in a judgment in favor of the plaintiff and against the defendants, Allen, West and Livingston, in the sum of $727.65, and declaring the same to be a lien against the concentrating plant described in the petition. From the judgment, West, Livingston and Allen appealed.

There are but two points involved in this appeal. First, is the plaintiff entitled to a personal judgment against the appellants? Second, is the plaintiff entitled to a mechanics' lien?

About January 30, 1909, H. A. Ayres was the owner of a mine known as the "High Tariff Mine" and was operating the same under a written mining license from the owner of the land on which the mine was located. On that day he made a written proposal to the appellants and others, stating that he was the owner of the exclusive right to mine for ten years the premises described in the petition; that at said time there was already mined or fully exposed and disclosed therein minerals of the value of $30,000, and he offered to sell to the appellants and others, known as the St. Louis

Syndicate, the right to acquire a half interest in his lease or license and the other property about the mine, upon a subscription by the Syndicate of the sum of $15,000, for the purpose of purchasing and erecting a mill upon the premises, for the purpose of mining and cleaning ore.

The proposition further contained a statement that a corporation was to be organized with a capital stock of $100,000, and the St. Louis Syndicate was to control fifty per cent thereof. The directors of the proposed corporation were to be three in number, Ayres to be one and the other two to be named by the Syndicate. The proposition was to be good for twenty days. The St. Louis Syndicate did not accept the proposition as made, but made a counter proposition which was signed by both parties, as follows:

"ST. LOUIS, 2-12-09.

"Our proposition is that Mr. Ayres shall sign an agreement not to draw any dividends from the mine, unless there is sufficient ore in sight, together with the equity in the mill, to equal the sum of $15,000. Should any question as to value of ore and mine come up, same shall be decided upon by an expert, decided on by both parties. In other words, the assets of the mine, as it now stands, up to 15 M, shall belong to the Syndicate, less the dividends drawn by the Syndicate.

"When the Syndicate has drawn 15 M in dividends from the mine, this agreement is void.

"It is understood that Mr. Ayres shall draw dividends as long as there is ore and equity in the mill, to the amount of $15,000. It is also understood that should the mine be abandoned, the Syndicate shall have the first right to the sales of its assets, up to $15,000 less the amount of dividends drawn by the Syndicate up to that time.

"The foregoing is agreed to by the parties above defined, and the title and interest of Herbert A. Ayres

in the property mentioned is hereby assigned to the St. Louis Syndicate according to the terms of proposition of January 30, 1909, by said Ayres to said Syndicate; details to be completed as therein agreed.

"H. A. AYRES,

"ST. LOUIS SYNDICATE, by W. H. West."

The St. Louis Syndicate was composed of Judge Barclay, the three appellants and Claude H. Edwards. On February 13, 1909, there was executed by Ayres on a letterhead of the law firm of which Judge Barclay was a member, the following:

"ST. LOUIS, MO., February 13, 1909.

"In consideration of funds advanced to me by the St. Louis Syndicate (amounting to ten thousand dollars) on account of purchase by said Syndicate of one-half interest in the mineral property and rights (mentioned in my proposal of January 30, 1909, to said Syndicate) further payment on Syndicate account are postponed until required (upon 30 days' notice) and the mining operations on said property from February 15, 1909, shall be continued and carried on for account of the joint ownership thereof by said Ayres and said Syndicate; and full accounts thereof shall be kept under my direction pending the further steps contemplated by the existing agreement between said parties.

"H. A. AYRES."

On the 27th day of March, 1909, Mr. Ayres and the appellants with others, organized a corporation known as the Buenos Ayres Mining Company. This corporation was organized in carrying out the proposal of Ayres made January 30th. On the 27th day of March, Mr. Ayres, by his deed, conveyed to the corporation his mining license and right to mine, together with all the other property of the High Tariff Mining Company.

There is no testimony that any of the appellants personally purchased any property or took any hand in the operation of the mine between February 12 and the organization of the corporation on March 27. Between the 10th day of March and the 29th day of that month, the plaintiff furnished material to Ayres, and the same was used by him in the erection of a concentrating plant upon the land described in the petition and as proposed in his proposition of January 30.

The testimony shows that at the time the materials were furnished, the plaintiff did not know Allen, West or Livingston, or that they had any interest in the property, but that plaintiff was acquainted with Ayres who had resided in Joplin for several years, and to him the credit was extended. The testimony tends to show that Ayres did not act honestly with the appellants; that the mill erected by him did not cost more than eight thousand dollars and that he led the appellants to believe that one Gerke had the contract. In his account to appellants he showed large sums paid to Gerke, when in truth and in fact Gerke had nothing to do with the building of the mill, and the checks were drawn to him for the purpose of leading the appellants to believe that the money advanced by them was used by Ayres in the erection of the mill.

Ayres was not served with personal process. The testimony shows he very suddenly left the State of Missouri about the time trouble came up over this matter. The mine was not a success and the appellants and their associates lost in the enterprise.

In addition to the written propositions, Mr. West on March 30, wrote the following letter to Mr. Steele, an agent of Ayres:

"When Ayres was here on Saturday I gave him a list of figures I would like sent to me each week, but have not heard this week from you, enclosing copy of pay-roll for week ending March 27th.

"In reference to opening up your books, would suggest that you open your ledger and use a day-book and cash-book in connection with same.

"Would suggest that you open an account with the Cunningham National Bank, another account for salaries and an account for supplies and operating expenses. Also an account with the St. Louis office, which you can charge with all moneys sent to me here.

"I understand that the mill is now in operation, and hope that Mr. Allen and Mr. Livingston can go down there some day this week."

On February 18th, Mr. West wrote Mr. Ayres the following letter:

"Your letter of February 17th is received, and in reply to same will say that the reason we thought it might be better to mill ore through the custom mills, was that we did not think the expense would be very much greater, and our idea was that you should deduct one-half of the profit on all the ore milled, and the balance we would apply toward the other $5000 on the mill. However, if you think best, we are perfectly willing to accumulate the ore until our own mill is built.

"Since you left we have subscribed the full amount of the $15,000, and are in a position to pay the balance if it should be necessary."

What was the relation between Ayres and the appellants after the payment of the $10,000 on February 13th, and the execution of the receipt therefor? The first proposition of Mr. Ayres was that if the appellants and their associates would pay $15,000 for the erection of a mill on his mining lease, the mill would be built and a corporation would be organized in which Ayres would have half of the stock, and the other parties the balance. To this, a counter proposition was made and signed by the parties, by which it was provided that Mr. Ayres should draw no dividends from the mine un-

less there was sufficient ore in sight, together with the equity in the mill, to equal the sum of $15,000. In other words, the mine up to $15,000 belonged to the Syndicate, less dividends drawn by the Syndicate; that Mr. Ayres should draw dividends as long as there was ore in sight and the equity in the mill amounting to $15,000, and the right, title and interest of Ayres in the mine was assigned to the St. Louis Syndicate, according to the terms of the proposition of January 30th, details to be completed.

When the $10,000 was paid, the receipt for it was written on the letter head used by one of the Syndicate, and it provided that the mining operations on the property from February 15, 1909, should be continued and carried on, on account of the joint ownership of Ayres and the Syndicate, and full accounts thereof to be kept under the direction of Ayres.

While there was no testimony of a formal acceptance by the Syndicate of the proposition stated by Ayres in his receipt of the $10,000, yet the same was received and kept by the Syndicate without objection. The letter of February 18, shows that the Syndicate was making suggestions that it might be better to mill the ore through the custom mills, as they did not think the expense would be very much greater, and stating that the Syndicate was of the opinion that Ayres should deduct one-half of the profit on all the ore milled, and the balance would be applied by the Syndicate toward the other $5000 on their $15,000 subscription. But it was further stated in that letter that if Ayres thought best, the appellants were willing that the ore should accumulate until the mill was built.

In Freeman v. Hemenway, 75 Mo. App. 615, it is said: "It is quite true that when persons acquire interest in lands apparently for the sole purpose of working mines in them they must be considered as entering into a commercial partnership."

On motion for rehearing in that case, the court fur-

ther said: "It is thus to be seen that a mining partnership relation may arise in two ways: First, by operation of law where there is no partnership agreement but co-operation by co-owners or joint tenants in the working of mining property (Lindley on Mines, sec. 797); and, second, by agreement of the co-owners or joint tenants."

The propositions and letters show that the appeliants and their associates, were to have a half interest in the property and that the mining operations were to be carried on for their joint use; that the syndicate was to have one-half of the dividends and profits from the operation of the mine.

While it may be said this evidence was not sufficient to create a partnership between the parties by an express agreement yet this evidence was sufficient to authorize the trial court to find a partnership existed by operation of the law, as declared in Freeman v. Hemenway, supra.

The testimony shows that the concentrating plant consisted of a frame engine and boiler room, 30 by 32 feet and 14 feet high; a crusher room 16 by 19 feet and ten feet high; one hoisting room 14 by 14 feet and 10 feet high; a jig room 25 by 68 feet long and 20 feet high, and in these buildings were engines, crushers, tables, pumps, boilers, belts, pulleys, shafting and other machinery making a complete plant for cleaning and preparing lead and zinc ores for market. The engine was set on a cement foundation which was made by excavating into the ground several feet, and filling the excavation with cement and to it the engine was bolted; and the other heavy machinery, such as jigs and rolls, were on cement foundations and fastened by bolts, etc. The engine room had a floor in it except the part occupied by the engine, and the floor was built around the engine bed; the boilers were set in concrete or brick foundations, and the belts were used in connecting the machinery and necessary to the operation thereof.

It was further shown that in removing the tables, engines and heavier machinery, there would be more or less destruction of the building proper.

The appellants claim that under the laws of this State relating to mechanic's liens, no lien is allowed where the person erecting the improvements is a mere licensee with a right to remove the machinery, buildings and improvements upon which the lien is claimed.

Mechanics' liens are purely a creature of statute in this country, and were unknown at common law. The principle upon which the statutes were originally enacted was to subject land to a lien for the material and labor expended in the construction of buildings which have, by being placed upon the land, become a part thereof. And for many years it was held that where the buildings and land were not owned by the same party, or were in any way separate in interest, the lien failed. This very often operated as an extreme hardship to the mechanic. In order to remedy that situation, legislation has been adopted in many States, ex-. tending the privileges of the lien to mechanics and materialmen who have furnished labor or material for buildings erected by persons on the lands of another. [Lumber Co. v. Harris, 131 Mo. App. 94, 110 S. W. 609; Boiler Works Co. v. Haydock, 59 Mo. App. 653; Crutcher v. Block, 91 Pac. 895; Jarrell v. Block, 92 Pac. 167; Shull v. Best, 93 N. W. 753; Oliver v. Davis, 81 Ia. 287; Missoula Merc. Co. v. O'Donnell, 60 Pac. 594; Thomas v. Smith, 42 Penn. 68; Forbes v. Misquito Fleet Yacht Club, 175 Mass. 436, 56 N. E. 615; Hughes v. Torgerson, 11 So. 209, 16 L. R. A. 600.]

The right to give the mechanic and materialman a lien upon buildings separate from the land, is not curtailed by constitutional provisions, and the whole question is purely statutory, and each State, by its own legislation and decisions, formulates its own rules. But when no special legislation exists providing for the mechanic's rights where the buildings and land are not

owned by the same party, the weight of authority is against the lien in such cases. On the other hand the great weight of authority is in favor of a liberal construction of the mechanic lien laws, to the end that the remedy intended to be granted the mechanic be not rendered inoperative, and the later decisions often overrule the earlier ones, and extend the lien to cases where it was formerly denied. [Forbes v. Mosquito Yacht Club, 56 N. E. 615.]

In the note to Zabriske v. Greater American Exposition Co., 62 L. R. A. 369, many States are cited wherein special legislation has been passed extending the privileges of the lien. In that note, however, it is declared that in Missouri, several strong decisions advocating liberal construction of lien laws have been overruled, and the court has finally settled on the doctrine that the lien may not be enforced upon the buildings separately from the land, except in cases expressly allowed by statute.

Our courts have always held the law should be liberally construed. [Crane & Co. v. Epworth Hotel Construction Co., 121 Mo. App. 209, 98 S. W. 795; Faulkner v. Bridgett, 110 Mo. App. 377, 86 S. W. 483; O'Shea v. O'Shea, 91 Mo. App. 221.]

For many years in this State, the right to the lien only existed in cases where buildings and other improvements had been erected upon the land under a contract with the owner, but finally section 4206 Revised Statutes 1899 was enacted, but the privileges and rights therein granted were limited to St. Louis, but subsequently the statute was made general. Under that statute, the courts have always held that it does not apply to cases where the tenant put trade fixtures upon the property, and wherein under a contract with the landlord the improvements remained the personal property of the tenant. [McMahon v. Vickery, 4 Mo. App. 225; Koenig v. Mueller et al., 39 Mo. 165; Foundry & Machine Co. v. Cole, 130 Mo. 1, 31 S. W. 922; Richard-

son v. Koch, 81 Mo. 264; Boiler Works Co. v. Haydock, 59 Mo. App. 653; Carroll v. Shooting the Chutes, 85 Mo. App. 563.]

In 1901 the Legislature repealed the statute and enacted a new one in lieu thereof and reading: "Every building or other improvement erected, or materials furnished according to the provisions of this article on leased or licensed lots or lands shall be held for the debt contracted for on account of the same and also the licensed interest or leasehold term for such lot and land on which the same is erected." The statute further provides that the purchaser of the improvement under the mechanic's lien act shall have the right to remove the improvements within sixty days. The only change in the new statute is that its provisions are extended to persons erecting improvements and furnishing material on licensed lots, and if the plaintiff in this case is entitled to have its lien sustained, it must be by virtue of this amendment.

The Scranton Mining & Smelting Co. was the owner of the property upon which the buildings were erected. On the 16th day of December, 1908, it granted to H. A. Ayres a license to prospect and mine the premises for a period of ten years. This license provided that Ayres acquired no interest in the land or ores by reason of his license contract, and that all shafts, drifts, openings of whatsoever nature, together with all the timbers supporting the same, belonged to the licensers and Ayres had no interest in the premises except the right to mine thereon; that all ore mined should be turned in to the licensors, and the licensors pay the licensee for his labor performed and expenses incurred in cleaning the ore, a certain per cent thereof.

It was further provided that any assignment, transfer or sub-letting of any interest in the lot or mines by the licensee, without the written consent of the licensors, should forfeit all rights of the licensee in the premises.

Without setting out all the provisions of the license contract, it may be said that when fairly construed, it is merely a license, and under it Ayres acquired no interest in the land or to the possession thereof, and that he had the right at the expiration or forfeiture of his license contract, to remove the buildings and improvements from the ground, and that such improvements remained personal property and were subject to sale under execution as personal property.

It is claimed by the appellants that the statute as amended, should not be construed to extend the privileges of the mechanic's lien to personal property; that it should only include that class of license wherein the licensee has placed his improvements upon the real estate in such a manner as to make them a part thereof, and with no right of removal. In this contention appellants are supported by the construction of the courts placed upon the statute prior to its amendment in reference to leased lots. The courts held that the lien did not extend to improvements on all leased lots, but only such improvements as become a part of the real estate and did not remain the personal property of the tenant. This is the construction given to the statute, so far as the same relates to leasehold interests both prior and subsequent to the amendment. [Carroll v. Shooting the Chutes, 85 Mo. App. 563; Boiler Works Co. v. Haydock, 59 Mo. App. 653; Lumber Co. v. Harris, 131 Mo. App. 95; Ottumwa Iron Works v. Muir, 126 Mo. App. 582, 105 S. W. 29.]

There is a marked difference between a license and a lease. Under the lease, the right of possession against the world is given to the tenant, while a license creates no interest in the land, but is simply an authority or power to use in some specific way. [Anderson's Law Dictionary, page 621; Tiedeman on Real Property, sec. 651; Century Digest, vol. 32, Cols. 2609-2614; Roberts v. Linn Ice Co., 73 N. E. 523; Chynowitch v. Granby Mining & Smelting Co., 74 Mo. 173; Foundry & Machine Co.

v. Cole, 130 Mo. 1, 31 S. W. 922; Lytle v. James, 98 Mo. App. 337, 73 S. W. 287.]

If we construe the amendment to mean that the mechanic has no lien for improvements on licensed lots except in cases where in the improvements become a part of the real estate and the licensee has no right to remove the same, then the Statute becomes a nullity. As the rule is if the licensee has erected buildings or improvements upon the land for his own use, he has the right to remove the same and they remain his personal property, and he must be given a reasonable time within which to remove the same. [Tiedeman on Real Estate, sec. 652; Shipley v. Fink, 2 L. R. A., N. S. 1002; Ingalls v. Railroad, 40 N. W. 524; Putman v. State, 132 N. Y. 344.]

The primary rule for the construction of all statutes of this State as laid down in the Revised Statutes, is that words and phrases shall be taken in their plain or ordinary meaning or usual sense, and regard is to be had to their general and proper use. [Revised Statutes 1899, section 4160; State v. Jones, 102 Mo. 305, 14 S. W. 946; State ex rel. v. Marion County Court, 128 Mo. 427, 31 S. W. 23.]

If we limit the right to a mechanic's lien to cases wherein the improvements become a part of the real estate proper, the amendment is a nullity, as there would be no cases wherein its provisions could be applied. And there is no presumption that the legislature intended to enact an absurd law nor one which is incapable of being intelligently enforced. [St. Joseph v. Landis, 54 Mo. App. 315; Verdin v. St. Louis, 131 Mo. 26, 36 S. W. 52.]

There is another well-known rule to be followed in the construction of statutes, to-wit: Statutes must be construed in reference to the subject-matter, the objects which prompted and induced their enactment and the mischief they were intended to remedy. [Neenan v. Smith, 50 Mo. 525; Spitler v. Young, 63 Mo. 42.] Also

the intent of the Legislature as contained in the statute, is the spirit of the law, and the construction of statutes is but a judicial reading of the intent of the law-making authority. [State ex rel. v. Hostetter, 137 Mo. 636, 39 S. W. 270; State ex rel. v. Slover, 126 Mo. 652, 29 S. W. 718.]

The intent of the Legislature and the reason for enacting the amendment, becomes apparent when the history of the law and the amendment are considered. The Supreme Court had rendered the opinion in Springfield Fdry. & Mach. Co. v. Cole, 130 Mo. 1, 31 S. W. 922, wherein it was held that persons mining for zinc or lead ore on the land of another, subject to printed rules, as provided in Revised Statutes 1899, section 8766-67, have no interest in the land, and that machinery placed by such licensees in a building on the land does not become a part of the land and is not subject to a mechanic's lien.

In the lead and zinc district of southwest Missouri at that time many costly improvements were being made upon real estate by licensees, and the improvements were of such a nature that if erected by the owner, they would have been part of the real estate and the mechanic would have been entitled to his lien thereon for material furnished and labor performed. But the court held that the statute did not give the lien in cases where the improvements were erected by a mere licensee. The amendment was introduced by a member of the Legislature from Jasper county, a lawyer of ability and who was well acquainted with the decisions of the courts. It was undoubtedly his intention and the intention of the Legislature to give the lien to the very class of cases denied by the court in Foundry & Machine Co. v. Cole.

It is not unreasonable to say that the Legislature intended to extend the provisions of the law so that a mechanic's lien may be enforced against personal property. Many States of the Union authorize such liens. In Wisconsin a lien is given by statute for labor performed in cutting and handling logs. In some other

States a mechanic's lien is expressly given by statute for all labor upon machinery, whether the same is attached to or ever becomes a part of the real estate. In our own State a lien is extended to labor and material furnished upon railroads. We also have statutory liens for boarding animals and a lien is given upon the baggage of guests at hotels or boarding houses. The landlord is given a lien for the crops raised upon the rented premises, and the seller is given a lien on execution for the purchase price of chattels sold. A mechanic's lien is given on buildings on mortgaged premises and leasehold interests, and as the whole matter is purely a subject of legislative regulation, it was proper for the Legislature to extend to the meritorious claimants a lien upon the property of a licensee for the materials furnished and labor performed in improving the same.

In this case, large frame buildings were erected, and heavy machinery placed therein and bolted to solid foundation made by excavating several feet into the earth, and the entire building filled with costly machinery, and used for the purpose of mining ore on the premises. For several years and at the present time these concentrating plants often cost more that $25,000, and have every appearance of being, and are, solid and substantial improvements to the real estate upon which they are situated.

When we consider the prior law and the history of the amendment and the mischief it intended to remedy, we are driven to the conclusion that it was the intention of the Legislature to give the benefit of the mechanic's lien to all persons who may furnish materials and perform labor in the erection of these mining plants by the licensees upon their licensed lots. In so holding, no persons will be injured, and the great mining interests of our State will be promoted. The mechanic will not hesitate to furnish material for these concentrating plants because the law has extended to him the same protection that it has to other mechanics. It is the his-

tory of the mining district that often the miner has expended his "last dollar" when his prospect is discovered, and in order to erect a mill and reap the harvest of his labors, it is necessary that credit be extended, and it will be much easier for him to obtain credit if the person extending the same has a lien upon the miner's improvements for the things he furnishes, and which have enhanced their value.

The appellants have made some objections to the sufficiency of the description of the real estate described in the petition, and the judgment of the court, but in as much as the respondent will only be able to enforce its lien against the buildings, that matter becomes immaterial. [Kirkwood Mfg. & Supply Co. v. Sunkel, 128 S. W. 258.]

We are of the opinion the circuit court judgment is supported by substantial evidence, and that the court correctly construed the mechanic's lien law as amended by the Act of 1901, and the judgment will be affirmed. All concur.